## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF: | |
| BEDROOM LOCATED AT SOUTHERN CORNER OF 129 JACKSON STREET, REYNOLDSVILLE, PA 15851 | Magistrate No. 21-1789 [**UNDER SEAL**] |

I, Eric Harpster, Task Force Officer of the Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants to search the following premises described as:

**TARGET RESIDENCE**: The bedroom located at the southern corner of 129 Jackson Street, Reynoldsville, PA 15851, and occupied by Darren DOUGLAS hereinafter, "**TARGET RESIDENCE** ," further described in Attachment a, for the things described in Attachment B

2.       In addition to being deputized by the DEA, I am a detective with the City of Pittsburgh Police Department.  I have been a law enforcement officer for the past 21 years.  During my employment and tenure as a law enforcement officer, I have participated in numerous investigations into the unlawful possession and distribution of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, in violation of Title 21 of the United States Code.  These investigations have involved the use of confidential sources, physical surveillance, electronic surveillance, pen register and toll analysis, and Title III intercepted wire and electronic communications.

1

3.	I have been a Pittsburgh police officer since September 2000.  As a Pittsburgh police officer, I was assigned to patrol and investigate criminal offenses occurring within Zone 5, which covers the eastern neighborhoods of the City of Pittsburgh, including Homewood and the surrounding neighborhoods.  As a Pittsburgh police officer, I have arrested hundreds of individuals for illegally possessing and/or trafficking in controlled substances as well as the criminal possession/use of firearms.  I was also assigned to the Pittsburgh Police Street Response Unit in 2005, where I made numerous arrests of individuals for illegally possessing and trafficking in controlled substances as well as the criminal possession/use of firearms.  In May 2006, I was assigned to the Allegheny County Violent Crimes and Firearms Task Force.  As a result, I was part of numerous long-term investigations of the illegal trafficking of controlled substances, which included personally engaging in the undercover purchase of various controlled substances.  I conducted several hundred hours of surveillance during these drug-trafficking investigations.

4.	I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants.  I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking.  In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations, and I have had hundreds of conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

5.     The facts and information contained in this affidavit are based upon my personal participation in this investigation and information provided by other law enforcement officers involved in this investigation.  Your Affiant has not submitted each and every fact known to him about the case, just those that he believes establishes probable cause.

6.     In a substantial number of residential searches executed in connection with the drug investigations in which I and fellow Agents and other investigators have been involved, the following kinds of drug-related evidence have typically been recovered from the residences of drug-traffickers:

a.     Controlled substances, such as marijuana, heroin, crack cocaine, powder cocaine, methamphetamine, and synthetic narcotics, such as fentanyl;

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

c.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union), cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

3

   f.  Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

   g.  Mobile electronic communication devices, such as cellular telephones and "smart phones", electronic messaging equipment, such as tablets, pagers, telephones answering machines, and their tapes, electronic storage devices, such as GPS devices and portable media players, and other such mobile electronic devices that store data, as well as the content therein;

   h.  Firearms and other dangerous weapons; and

   i.  Photographs, in particular, photographs of co-conspirators, assets, and/or drugs.

  7.  In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, utility and telephone bills, statements, identification documents, and keys to safe deposit boxes and storage facilities.

  8.  Based upon my training and experience, as well as the knowledge and experience of other agents and police officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residence(s) and/or their business records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled

substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

9.      Based upon my training and experience, I also am aware that it is a generally common practice for traffickers to conceal at their residences and/or their business large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers must maintain on hand the large amounts of United States currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or their business.

10.     Based upon my training and experience, that drug traffickers commonly have in their possession that is on their person, at their residences and/or their business, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. I also am aware that, typically, drug traffickers possess these firearms and other dangerous weapons to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

11.     Further, I am aware that narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles.

12.     Further, I am aware that persons involved in significant drug trafficking, conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities.

13.     When drug traffickers amass proceeds from the sale of drugs, drug traffickers often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, drug traffickers often use different techniques, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds.

14.     Further, I am aware that drug traffickers commonly maintain books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.  Drug traffickers also take or cause to be taken photographs of themselves, their associates, their property, and their product usually maintain these photographs in their possession.

15.     Further, I am aware that drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics and the paraphernalia includes, but is not limited to

scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution.

16.    In addition, as a result of conversations with Assistant United States Attorneys who have prosecuted drug trafficking cases in federal court, I am aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was directly observed to occur there. *See United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (explaining that, in drug cases, evidence is likely to be found where drug dealers reside).

17.    Further, I am aware that drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names; and that they maintain such documents as evidence of their false identities in their residences, businesses, and automobiles together with evidence of their true identities.

18.    I have knowledge that drug traffickers commonly conceal their activities from members of the public by transacting their business in a convert manner and frequently conducting their business during the nighttime hours when darkness helps conceal their activities. Moreover, it is highly unusual for individuals primarily engaged in drug trafficking activities to associate in their businesses or social activities with others not engaged in the same drug trafficking activities.

19.    I have knowledge that it is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or their business, for their ready access and to conceal them from law enforcement authorities.

20.    My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this affidavit, arise from the following:

      a.    My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

      b.    My involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations;

      c.    Discussion with other members of DEA and law enforcement officers, both about the facts of this case in particular and about trafficking in general; and

      d.    Other intelligence information provided through law enforcement channels.

21.    Since this Affidavit is being submitted for the limited purpose of securing a search warrant for these residences, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are presently located at the **TARGET RESIDENCE**.  I have the following additional information from my participation in the instant investigation and from my conversations with other law enforcement officers involved in this investigation.

### **FACTS ESTABLISHING PROBABLE CAUSE**

22.    A joint investigation conducted by the Drug Enforcement Administration (DEA), United States Postal Service – Office of Inspector General (USPS-OIG), Pennsylvania State Police (PSP), Homeland Security Investigations ("HSI"), and the United States Postal Inspection

Service (USPIS) has revealed the HILLEBRAND Drug Trafficking Organization ("HILLEBRAND DTO") is an organization that is responsible for the trafficking and distribution of large amounts of methamphetamine and marijuana from Oregon/California/Nevada to Pennsylvania through the United States Postal Service ("Postal Service"). The HILLEBRAND DTO also transports narcotics proceeds from the distribution of controlled substances via the Postal Service to the Stockton/Modesto/Manteca, CA area from Pennsylvania.

 23. Your Affiant believes that the head of the Organization in the Western District of Pennsylvania, Derek HILLEBRAND ("HILLEBRAND"), is involved in a conspiracy to distribute narcotics in the Western District of Pennsylvania (and elsewhere). Based on your Affiant's knowledge of the investigation, your Affiant believes that HILLEBRAND contacts George CHARLAN ("CHARLAN"), and CHARLAN supplies the HILLEBRAND DTO with methamphetamine and marijuana. CHARLAN receives methamphetamine from two different sources, Armando RAZO JR. ("RAZO") and Marco ARMENTA (ARMENTA). CHARLAN either obtains methamphetamine by having his associate, Christian MALDONADO ("MALDONADO") purchase it from RAZO, or CHARLAN contacts ARMENTA to obtain methamphetamine, which ARMENTA receives from Juan VILLAGRAN ("VILLAGRAN"), who is supplied by Marco GALVEZ ("GALVEZ"). RAZO or ARMENTA then provide methamphetamine to MALDONADO, who packages the methamphetamine and arranges for it to be shipped to the HILLEBRAND DTO in the Western District of Pennsylvania.

 24. During the course of the investigation, which began in July 2020 and is ongoing, investigators identified narcotics customers, sources of supply, and associates for the HILLEBRAND DTO. Specifically, through the interception of telephones utilized by HILLEBRAND, SCHOENING, ADEKUNLE, MALDONADO, CHARLAN, RAZO,

VILLAGRAN, and ARMENTA, agents identified members of the Organization whose involvement is relevant to this affidavit.

25.     On August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a six-count Indictment arising out of this investigation, which is filed at Criminal No. 21-355 (W.D.Pa.).

26.     Count One of the Indictment charges that from in and around July 2020, and continuing thereafter to in and around August 2021, in the Western District of Pennsylvania and elsewhere, the defendants, DEREK HILLEBRAND, GEORGE CHARLAN, YUSUF ADEKUNLE, MARCO ARMENTA, SILVIA AYALA, FRANCISCO BARBA, AMY BORTOT, BRANDON CODER, TERRENCE DOUGHERTY, DARREN DOUGLAS, MARCO GALVEZ, CHAD GASBARRE, DANIELLE GILLAM, KENNETH GILLAM, MORGAN GREGORY, DARRYL ISAACS, KRISTY LEPIONKA, CHRISTIAN MALDONADO, LISANDRA MALDONADO, ABEL PEREZ, JEFFREY PETERS, MEGAN PYNE, ARMANDO RAZO JR., CHRISTOPHER ROBERTSON, BRENTON RYANS, RYAN SCHOENING, BRENT SHAFFER, CHRISTINA SHAFFER, MELVIN SHELANDER, DARNELL SMITH, TAYLOR THOMAS, JUAN VILLAGRAN, JOSE VILLALOBOS, JAMES WHITE, JAMES WILLIAMS, TRAVIS WILLIAMS, and JUSTIN ZERUTH, did knowingly, intentionally and unlawfully conspire with one another and with persons both known and unknown to the grand jury, to possess with intent to distribute and distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections

841(a)(1) and 841(b)(1)(A)(viii), 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii), and a quantity of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), in violation of Title 21, United States Code, Section 846.

27.    Additionally, on August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a one-count Indictment related to this investigation, which is filed at Criminal No. 21-354 (W.D.Pa.), charging Doug Austen ("AUSTEN") with Possession with Intent to Distribute and Distribution of 50 Grams or More of Methamphetamine.

28.    Additionally, on August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a two-count Indictment related to this investigation, which is filed at Criminal No. 21-358 (W.D.Pa.), charging DIEGO ZAMUDIO, KIMARI JACKSON, TERRY KELLY, KAREEM ROCK, RYAN SCHOENING, and JASON WHITAKER with Conspiracy to Possess with Intent to Distribute and Distribute of 500 Grams or More of Methamphetamine at Count One and KIMARI JACKSON and KAREEM ROCK with Possession with Intent to Distribute 500 Grams or More of Methamphetamine, 50 Grams or More of Methamphetamine, and 40 Grams or More of Fentanyl at Count Two.

29.    Additionally, on August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a two-count Indictment related to this investigation, which is filed at Criminal No. 21-353 (W.D.Pa.), charging YUSUF ADEKUNLE, ADRIAN ALVAREZ, and JESUS GONZALEZ with Conspiracy to Possess with Intent to Distribute and Distribute Five Kilograms or More of Cocaine at Count One and Possession with Intent to Distribute Five

Kilograms or More of Cocaine at Count Two.

30.     Additionally, On August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a two-count Indictment related to this investigation, which is filed at Criminal No. 21-356 (W.D.Pa.), charging BRENT CODER, with Possession with Intent to Distribute and Distribute a Quantity of a Mixture and Substance Containing a Detectible Amount of Methamphetamine at Count One and Possession With Intent to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectible Amount of Methamphetamine at Count Two.

## BACKGROUND OF INVESTIGATION

31.     In July of 2020, HILLEBRAND was arrested for a parole violation because he was in possession of drug paraphernalia, and "owe sheet," and a large amount of cash. HILLEBRAND contacted the local district attorney's office offering to provide information about drug trafficking in the counties of Clearfield and Jefferson, and your Affiant was contacted by the local investigators.  Your Affiant began obtaining information from HILLEBRAND about other drug dealers.  Your Affiant believes that HILLEBRAND has provided accurate information; however, your Affiant believes that HILLEBRAND minimized or excluded his own involvement in drug activities.

32.     In relation to DEA's investigation of the Organization, the DEA was able to successfully utilize HILLEBRAND as a Confidential Source to provide detailed information about the Organization and the Organization's drug trafficking operations.  In the course of HILLEBRAND's cooperation, he has provided information about SCHOENING, SMITH, Yusuf ADEKUNLE ("ADEKUNLE"), and others involved in the Organization.  During the course of the investigation, however, it was determined that HILLEBRAND was continuing to engage in

the trafficking of large amounts of methamphetamine, cocaine, and marijuana in conjunction with SCHOENING, D. SMITH, ADEKUNLE, and other members of the Organization.

33.     Investigators became aware of HILLEBRAND's continued illegal activities soon after HILLEBRAND began providing investigators with information, and investigators quickly determined that HILLEBRAND was providing investigators with information pertinent to the drug trafficking activities of the Organization while omitting his own involvement.  However, investigators continued to communicate with HILLEBRAND, and investigators were able to independently corroborate the information provided by HILLEBRAND.  This corroboration included the interdiction of a parcel containing 2.2 kilograms of pure methamphetamine on September 13, 2020 that was shipped to 2238 Belsena Rd., Madera, Pennsylvania, from California; the seizure of six kilograms of cocaine on October 22, 2020 from a private plane at Pittsburgh International Airport; and the seizure of 10.6 kilograms of pure methamphetamine on April 21, 2021 that was transported by vehicle from Houston, Texas to Clearfield County, Pennsylvania, all three of which are described in detail below.

34.     Without any assistance from HILLEBRAND, in August 2020, investigators became aware that multiple parcels of suspected methamphetamine were being mailed from California to various locations in Pennsylvania counties of Clearfield and Jefferson. Investigators observed HILLEBRAND personally receive several of these suspected methamphetamine packages.  As described below, during the course of this investigation, HILLEBRAND has been identified as a large-scale distributor of methamphetamine, cocaine, marijuana, and other substances throughout the Pennsylvania counties of Allegheny, Beaver, Elk, Jefferson, and Clearfield.

35.     On August 25, 2020, investigators received information from Confidential Source

5[1] ("CS5") regarding HILLEBRAND.  CS5 informed investigators that CS5 had recently had a conversation with HILLEBRAND, during which HILLEBRAND revealed to CS5 that HILLEBRAND took back control of the Organization from SCHOENING.

36.     HILLEBRAND was intercepted between November of 2020 and May 2021, discussing his drug distribution business, including ordering bulk amounts of methamphetamine, cocaine, and marijuana and distributing those narcotics to members of his Organization.  Through intercepted communications, Investigators believe that HILLEBRAND ordered over 100 kilograms of methamphetamine and 1,000 kilograms of marijuana from George CHARLAN, who resides in Oregon, including approximately 10 kilograms of methamphetamine that was seized. The interceptions have revealed numerous associates of HILLEBRAND in Western Pennsylvania. Further, through the information collected from the interceptions, your Affiant identified Christian MALDONADO, CHARLAN's associate who resides in California, and several methamphetamine suppliers that also reside in California, all of whom were intercepted during the investigation.

## WIRETAP INFORMATION

37.     As the investigation progressed, your Affiant applied for multiple Title III wire and electronic interceptions of HILLEBRAND and associates, co-conspirators, and sources of supply.  The interceptions have been combined with physical surveillance, other investigative methods, and have identified members of the Organization and the modus operandi of the Organization.

---

1 CS5 was referred to as CS5 throughout the wiretap affidavits written during the course of this investigation.  He/she will be referred to as CS5 throughout this affidavit for consistency.  CS5 is currently on probation with Clearfield County for a conviction for misdemeanor disorderly conduct.  CS5 agreed to be debriefed relative to her/his involvement in the illegal distribution of drugs in an attempt to receive leniency with respect to violations of his/her conditions of probation.  CS5 has convictions for misdemeanor harassment and theft.  CS5 has provided information throughout this investigation.

38.     On November 24, 2020, your Affiant applied for and obtained the initial Title III wire and electronics interception of two phones used by HILLEBRAND, which was read and approved by Chief Judge Mark R. Hornak, at Magistrate Number 20-1594.  HILLEBRAND is the main target of the investigation.

39.     Since the initial interceptions, your Affiant has applied for additional interceptions of HILLEBRAND and other co-conspirators and sources of supply.  The second round of interceptions was signed on December 22, 2020, at Magistrate Number 20-1594(a), by Chief Justice Hornak.  This affidavit allowed for the continued interceptions of HILLEBRAND.

40.     The third round of interceptions was signed on January 27, 2021, at Magistrate Number 20-1594(b), by Chief Justice Hornak.  This affidavit allowed for the continued interceptions of HILLEBRAND, in addition to the interceptions of George CHARLAN, the source of supply of methamphetamine and marijuana, and associates and co-conspirators: ADEKUNLE, and SCHOENING.

41.     Your Affiant has applied for additional rounds of interceptions of the sources of supply and other co-conspirators operating in California of the United States.  Your Affiant is currently intercepting three phones used by VILLAGRAN and one phone used by ARMENTA,.  These applications were read and approved by Chief Magistrate Judge Hornak at Magistrate No. 20-1594(h).  This was signed on August 12, 2021, and the phone used by ARMENTA was signed in an amended affidavit on August 17, 2021.

### TARGET RESIDENCE

42.     On August 31, 2021, at approximately 8:00 am, special agents with the DEA attempted to execute a federal arrest warrant on Darren DOUGLAS at his residence located at 129 Jackson Street, Reynoldsville, PA 15851 (TARGET RESIDENCE 1).

43.     Gloria SNYDER ("SNYDER"), DOUGLAS' grandmother, advised investigators that DOUGLAS was not present inside of the residence.

44.     SNYDER lead investigators to a room utilized by DOUGLAS to show investigators that DOUGLAS was not present.  SNYDER advised investigators that only DOUGLAS utilizes this bedroom.  This bedroom is located in the southern corner of the residence.

45.     While inside of the room utilized by DOUGLAS investigators observed a large amount of U.S. currency arranged in folded and rubber banded stacks consisting of $100 and $20 bills in a gray plastic bag that was situated on a shelf at the head of DOUGLAS' bed.

46.     During the course of the investigation, it was determined that HILLEBRAND was conducting drug trafficking activities in and around 44 Horseshoe Drive, Reynoldsville, PA, 15851.  Starting from around December 22, 2020, a pole camera was utilized at 44 Horseshoe Drive, to observe activity associated at this residence.

47.     Throughout the course of this investigation, DOUGLAS has been observed several times arriving at 44 Horseshoe Drive, to deliver large amounts of money to Derek HILLEBRAND, and in return would receive narcotics from HILLEBRAND.

48.     Throughout the course of this investigation, DOUGLAS has been identified as a distributor of large amounts of methamphetamine and would be in possession of large amounts of U.S. Currency.

49.     Based on the above described investigation, Your Affiant believes that evidence of violations of Title 21, United States Code, Section 841 (distribution and possession with intent to distribute controlled substances), 21 United States Code 846 (conspiracy), and Title 18 United States Code 1956 (money laundering) (the TARGET OFFENSES), that being the possession with

16

intent to distribute methamphetamine and marijuana as well as proceeds of the distribution of methamphetamine and marijuana, will be located within the **TARGET RESIDENCE**.

50. Based on the above, your Affiant believe that the items, documents and records listed in Attachment B to the requested search warrant constitute evidence, fruits and instrumentalities relating to the TARGET OFFENSES, that may be found at the **TARGET RESIDENCES**, as described in Attachment A.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

51. As described above and in Attachment B, this application seeks permission to search for records that might be found in the **TARGET RESIDENCE**, in whatever form they are found. One form in which the records might be found at the **TARGET RESIDENCE** is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41I(2)(B).

a. *Probable cause.* I submit that if a computer or storage medium is found at the **TARGET RESIDENCE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons: Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.        Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.        Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.        Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.    *Forensic evidence.*  As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET RESIDENCE** because:

18

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

19

Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

20

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to purchase narcotics on the DarkNet or through other online vendors, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer

21

was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

53.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.

Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

55.     Because several people may share each of the **TARGET RESIDENCE** as a residence, it is possible that the **TARGET RESIDENCE** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this application could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

        WHEREFORE, given the above, your Affiant respectfully requests that the Court

issue an order authorizing warrants allowing for searches of the above-referenced locations.

All of the above information is true and correct to the best of my knowledge, information and belief.

/s/ Eric Harpster
Eric Harpster
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 31st day of August, 2021

HONORABLE LISA PUPO LENIHAN
United States Magistrate Judge
Western District of Pennsylvania

# ATTACHMENT A

**THE BEDROOM LOCATED AT THE SOUTHERN CORNER OF 129 JACKSON STREET, REYNOLDSVILLE, PA 15851**, **TARGET RESIDENCE 1,** is further described as a two-story residence with multi-colored siding, and an enclosed porch on the front of the residence, located in Winslow Township, Jefferson County. The back of the residence has a white door located near the center of the residence. The right side of the house also has a small attached enclosed porch.



## **ATTACHMENT B**

### PROPERTY TO BE SEIZED

Evidence, instrumentalities, contraband, or fruits of violations of Title 21 United States Code, Section 841 (distribution and possession with intent to distribute controlled substances) and Title 21 United States Code 846 (conspiracy), Title 18 United States Code 1956 (money laundering), (the TARGET OFFENSES), including the following:

a)      Any and all controlled substances;

b)      Drug paraphernalia, to include narcotics cutting agents, glassine baggies, smoking pipes, grinders, digital scales, decoy can-safes, hydraulic presses, and any other type of device/equipment that can be used to ingest, inject, inhale, consume and/or introduce into the human body any illegal narcotics.

c)      Items that also may be used to manufacture, compound, convert, process, produce, prepare, test, analyze, package, repackage, store, contain, manufacture, cultivate, and/or conceal;

d)      Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose, and lactose, used, intended for use or designed for use in cutting a controlled substance.

e)      Financial and business records, whether or not maintained electronically or by computer, including, but not limited to: books, records, receipts, notes, ledgers, journals, memoranda, address and/or telephone books, tapes, computer disks, computers relating to the transportation, ordering, purchase and distribution of controlled substances; United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

f)      Documents indicating travel in interstate and foreign commerce, to include airline tickets; notes and travel itineraries; airline schedules; bills; charge card receipts; hotel,

26

motel, and car rental statements; correspondence with travel agencies and other travel-related businesses; airline, rent-a-car, and hotel frequent flier or user cards and statements; passports and visas; papers or documents of identity/nationality; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

g)      Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks, bank deposit tickets, safe deposit box keys, and memoranda and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

h)      United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

i)      Photographs, in particular, photographs of co-conspirators, of assets and/or of controlled substances;

j)      Indicia of occupancy, residence and/or ownership of the premises described above, including but not limited to utility and telephone bills, canceled envelopes, and keys;

k)      Any and all firearms which may be used to facilitate transactions in controlled substances;

l)      Mail matter (all classes), Priority Mail , Priority Mail Express, and International Mail parcels and packaging, DHL, FedEx, and UPS parcels and packaging, customs declarations and other records, and other correspondence which reflect names and addresses of suspected co-conspirators in the trafficking and mailing of drugs and cash proceeds; and

m)      Any computer, computing device, laptops, tablet, smartphones, cellular telephones, external hard drives, computer hardware, software, related documentation, and electronic storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.

27

n) Any power cords, lightning cables, or any other chargers designed to charge the battery on any electronic devices that are seized.

For any computer, laptops, cell phones, tablets, or storage medium, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a) Any and all evidence related to the TARGET OFFENSES, including correspondence and/or communications,

b) evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d) evidence of the lack of such malicious software;

e) evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the COMPUTER user;

f) evidence indicating the COMPUTER user's state of mind as it relates to the TARGET OFFENSES;

g) evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h) evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i)      evidence of the times the COMPUTER was used;

j)      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k)      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l)      records of or information about Internet Protocol addresses used by the COMPUTER;

m)      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n)      contextual information from the COMPUTER necessary to understand the evidence described in this attachment.

In searching the COMPUTER, the federal agents may examine all of the data contained in the COMPUTER to view its precise contents and determine whether the COMPUTER and/or data falls within the items to be seized as set forth above. In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

For those COMPUTERS found within a search location where multiple individuals, in addition to the target of this investigation are located, federal agents will make reasonable efforts to ascertain whether the COMPUTER is used by or belongs to a target of the investigation to facilitate the commission of the TARGET OFFENSES. To the extent it becomes readily apparent that the COMPUTER was unlikely used in conjunction with or to facilitate in any way the commission of the TARGET OFFENSES, federal agents will not seize or search the COMPUTER beyond that which is necessary to ascertain the nature of its involvement in the TARGET

OFFENSES.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, gambling machines, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## ITEMS TO BE SEIZED FROM ELECTRONIC STORAGE MEDIA

A.      Incoming and outgoing e-mails, chats, instant messages, texts messages, or any other types of communications, as well as call, text message, or other types of communication logs;

B.      Internet browser histories showing what internet sites were visited, for how long, and how often;

C.      Contact lists;

D.      Photo and video galleries;

E.      Navigation, mapping, and GPS files;

F.      For cellular telephones - telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone;

G.      Evidence indicating who used the electronic device and when; and

H.      Any of the items set forth section I of this attachment that are capable of being stored electronically.